**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**AT EVANSVILLE**

EDWINA BILLHIMER and DANIEL CENNAMO, on behalf of themselves and others similarly situated,

Plaintiffs,

v.

READERSMAGNET, LLC and ELINK SYSTEMS AND CONCEPTS CORP.

Defendants.

No. 3:24-cv-00209-MPB-CSW

Hon. District Judge Matthew P. Brookman

Hon. Magistrate Judge Crystal S. Wildeman

**PLAINTIFFS' MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

Page(s)


I. INTRODUCTION .......... 1

II. FACTUAL BACKGROUND .......... 3

A. ReadersMagnet Sells Its Services by Telemarketing Through eLink. .......... 3

B. Plaintiffs' Numbers Were on the Registry, and Defendants Called Them Anyway. .......... 4

C. Defendants' Own Data Identify the Class. .......... 5

D. Defendants Refresh Their Registry Scrub Only Once a Year. .......... 6

E. Defendants' Consent Contentions Are Unsupported by Any Produced Evidence. .......... 7

III. LEGAL STANDARD .......... 8

IV. ARGUMENT .......... 9

A. The Court Should Consider Mr. Woolfson's Analysis, Which Rests on a Reliable Methodology. .......... 9

B. The Class Satisfies Rule 23(a). .......... 11

1. The Class is ascertainable. .......... 11

2. Numerosity is satisfied. .......... 12

3. Commonality is satisfied. .......... 13

4. Typicality is satisfied. .......... 14

5. Plaintiffs and their counsel are adequate. .......... 15

C. Common Questions Predominate. .......... 16

1. The elements of a Registry claim are provable with common, record-based evidence. .......... 17

2. Whether ReadersMagnet is answerable for eLink's calls is a single, classwide question. .......... 17

3. Whether the numbers are residential can be resolved with classwide proof. .......... 20

4. Consent and established business relationship are not individualized issues. .......... 23

5. Standing, damages, and defenses do not defeat predominance. .................................. 25

D. A Class Action Is Superior. ........................................................................................ 26

V. CONCLUSION ........................................................................................................... 27

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*A Custom Heating & Air Conditioning, Inc. v. Kabbage, Inc.*,
2018 WL 488257 (N.D. Ill. Jan. 18, 2018) .......... 23

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) .......... 16

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) .......... 8

*Anderson v. Weinert Enters., Inc.*,
986 F.3d 773 (7th Cir. 2021) .......... 12

*Bell v. PNC Bank, N.A.*,
800 F.3d 360 (7th Cir. 2015) .......... 8

*Bilek v. Fed. Ins. Co.*,
8 F.4th 581 (7th Cir. 2021) .......... 9, 18

*Birchmeier v. Caribbean Cruise Line, Inc.*,
302 F.R.D. 240 (N.D. Ill. 2014) .......... 24

*Blow v. Bijora, Inc.*,
55 F.3d 793 (7th Cir. 2017) .......... 9, 23

*Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*,
843 F.3d 1119 (6th Cir. 2016) .......... 24

*Chennette v. Porch.com, Inc.*,
50 F.4th 1217 (9th Cir. 2022) .......... 20

*Cordoba v. DIRECTV, LLC*,
942 F.3d 1259 (11th Cir. 2019) .......... 25

*De La Fuente v. Stokely-Van Camp, Inc.*,
713 F.2d 225 (7th Cir. 1983) .......... 14

*In re Dish Network, LLC*,
28 FCC Rcd. 6574 (2013) .......... 9

*Donaca v. Dish Network, LLC*,
303 F.R.D. 390 (D. Colo. 2014) .......... 12, 24

*Gopalratnam v. Hewlett-Packard Co.*,
877 F.3d 771 (7th Cir. 2017) .................................................................................... 9

*Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*,
29 F.4th 839 (7th Cir. 2022) ................................................................................ 8, 16

*Hand v. Beach Entm't KC, LLC*,
456 F. Supp. 3d 1099 (W.D. Mo. 2020) ............................................................ *passim*

*Hossfeld v. Allstate Ins. Co.*,
179 F.4th 1046 (7th Cir. 2026) ........................................................................ *passim*

*Klassen v. Solid Quote LLC*,
702 F. Supp. 3d 1052 (D. Colo. 2023).................................................................... 21

*Kohen v. Pac. Inv. Mgmt. Co.*,
571 F.3d 672 (7th Cir. 2009) .................................................................................. 22

*Krakauer v. Dish Network L.L.C.*,
311 F.R.D. 384 (M.D.N.C. 2015) .................................................................... *passim*

*Krakauer v. Dish Network, L.L.C.*,
925 F.3d 643 (4th Cir. 2019). ........................................................................... *passim*

*Legg v. PTZ Ins. Agency, Ltd.*,
321 F.R.D. 572 (N.D. Ill. 2017).............................................................................. 23

*Manno v. Healthcare Revenue Recovery Grp., LLC*,
289 F.R.D. 674 (S.D. Fla. 2013).............................................................................. 26

*Manpower, Inc. v. Ins. Co. of Pa.*,
732 F.3d 796 (7th Cir. 2013) .................................................................................. 10

*Mantha v. QuoteWizard.com, LLC*,
347 F.R.D. 376 (D. Mass. 2024)....................................................................... *passim*

*McLaughlin Chiropractic Associates, Inc. v. McKesson Corp.*,
606 U.S. 146 (2025),................................................................................................ 21

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir. 2012) ............................................................................... 9, 17

*Mullins v. Direct Digit., LLC*,
795 F.3d 654 (7th Cir. 2015). .................................................................................. 11

*Murray v. GMAC Mortg. Corp.*,
434 F.3d 948 (7th Cir. 2006) ........ 13

*Payne v. Sieva Networks, Inc.*,
347 F.R.D. 224 (N.D. Cal. 2024) ........ 21, 22

*Physicians Healthsource, Inc. v. A–S Medication Sols., LLC*,
318 F.R.D. 712 (N.D. Ill. 2016) ........ 23

*Santiago v. City of Chicago*,
19 F.4th 1010 (7th Cir. 2021). ........ 8

*Suchanek v. Sturm Foods, Inc.*,
764 F.3d 750 (7th Cir. 2014). ........ 13

*Toney v. Quality Res., Inc.*,
323 F.R.D. 567 (N.D. Ill. 2018). ........ *passim*

*Wagner v. NutraSweet Co.*,
95 F.3d 527 (7th Cir. 1996). ........ 14

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011). ........ 13

*Wilson v. Hard Eight Nutrition LLC*,
804 F. Supp. 3d 1141 (D. Or. 2025). ........ 21

**Rules & Regulations**

47 C.F.R. § 64.1200(c) ........ 21
47 C.F.R. § 64.1200(c)(2)(i)(D) ........ 26
47 C.F.R. § 64.1200(c)(2)(ii) ........ 9
47 C.F.R. § 64.1200(c)(2)(ii). ........ 25
47 C.F.R. § 64.1200(d) ........ 21
47 C.F.R. § 64.1200(f)(15) ........ 14, 23
47 C.F.R. § 64.1200(c)(2). ........ 8
47 C.F.R. § 64.1200(c)(2)(ii) ........ 15
Fed. R. Civ. P. 23(a) ........ 2
Fed. R. Civ. P. 23(a)(2) ........ 13
Fed. R. Civ. P. 23(b)(3) ........ *passim*
Fed. R. Civ. P. 23(g)(1)(B) ........ 15, 27
Fed. R. Civ. P. 23(g)(1)(B) ........ 16

**<u>Statutes</u>**

47 U.S.C. § 227(c)(2)–(3). ........................................................................................................ 8
47 U.S.C. § 227(c)(5)........................................................................................................ *passim*

# I. INTRODUCTION

This case presents a question that one jury can answer once for every class member. ReadersMagnet, LLC ("ReadersMagnet") sells publishing and book-marketing services to authors, and it did so through an outbound telemarketing campaign carried out by eLink Systems and Concepts Corp. ("eLink"). ReadersMagnet has already admitted the structure of that campaign under oath: eLink was "hired to perform telemarketing services for ReadersMagnet," and the eLink employees who called Plaintiff Edwina Billhimer were "publishing consultants who were responsible for making telephone calls to the various authors to, in part, promote the services offered by ReadersMagnet." (Ex. 5, ReadersMagnet's Responses to Plaintiff's Discovery Requests, Nos. 3, 7.) Its designee has since confirmed that eLink was authorized to call prospective customers to promote ReadersMagnet's services, in its name. (Ex. 6, Deposition Transcript of John Carl Abines 7:20–8:7.)

The calling data show that the campaign dialed telephone numbers that were on the National Do Not Call Registry (the "Registry"). Defendants' own "DNCDTA" files, which index the numbers called by year from 2021 through 2024, contain 49,548 distinct telephone numbers. (Ex. 7, Declaration of Aaron Woolfson ¶ 48 & Ex. 7-A.) Plaintiffs' expert, Aaron Woolfson, compared those files to Registry data and identified 24,743 unique numbers that were on the Registry, for more than thirty days, in the same year that Defendants' own data marked them "SAFE" to call. (Ex. 7 ¶¶ 49–52.) Plaintiff Edwina Billhimer's number is one of them, (*id.* ¶ 52), and Plaintiff Daniel Cennamo's number is on the resulting Class list as well. (Ex. 1, Declaration of Anthony I. Paronich ¶ 7.) Mr. Woolfson has also described the reliable method by which the call detail records will identify the numbers that received two or more calls within 365 days of having been on the Registry for more than thirty days. (Ex. 7, ¶¶ 2–3, 31(g).)

The TCPA's Do Not Call provisions are built for class treatment. As the Fourth Circuit explained in affirming certification of a Registry class, the private right of action in § 227(c)(5) "requires a plaintiff to initially show two things: a number on the Do-Not-Call registry, and two calls made to that number in a year." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 655–56 (4th Cir. 2019). Both showings are made here from Defendants' own records and a single expert methodology, the second once the call detail records are applied. The remaining contested issues, whether ReadersMagnet is answerable for eLink's calls, whether any consent or established business relationship existed, and whether the numbers are residential, turn on Defendants' conduct and on classwide proof, not on anything an individual class member did.

Therefore, pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), Plaintiffs Edwina Billhimer and Daniel Cennamo ("Plaintiffs") move to certify the following Class:[1]

> All persons within the United States whose telephone numbers were on the National Do Not Call Registry for more than thirty (30) days, and who received two (2) or more telephone calls within 365 days of the number being on the Registry for more than thirty (30) days, from eLink or anyone acting on its behalf promoting ReadersMagnet's services within the four years prior to the filing of the Complaint, as reflected in the DNCDTA files and call detail records produced by Defendants.

[1] The definition tracks the criteria Mr. Woolfson was asked to apply and has applied to Defendants' data: numbers on the Registry for more than thirty days that received two or more calls within 365 days. (Ex. 7 ¶¶ 2–3, 31(f)–(g).) It refines the class pleaded in the Second Amended Complaint. (SAC ¶ 77, ECF No. 46.) It omits the pleaded element that the member "had previously asked for the calls to stop," which is not an element of a Registry claim, and it omits the word "residential" to avoid a fail-safe class, as the court did in *Mantha*, 347 F.R.D. at 391–92 (refining Registry class definition by "removing the word 'residential'"). It is limited to voice calls. *See Jones v. Blackstone Med. Servs., LLC*, 792 F. Supp. 3d 894, 899–900 (C.D. Ill. 2025) ("under a plain reading, Section 227(c)(5) of the TCPA does not regulate text messages"); *Davis v. CVS Pharmacy, Inc.*, 797 F. Supp. 3d 1270, 1272 (N.D. Fla. 2025) ("a text message is not a 'telephone call'"). Excluded are Defendants, their agents and employees, counsel, and the Court and its staff. Plaintiffs reserve the right to seek certification of an internal do-not-call class and to amend the definition as the record develops. Courts may refine class definitions at certification. *Mantha*, 347 F.R.D. at 391.

## II. FACTUAL BACKGROUND

### A. ReadersMagnet Sells Its Services by Telemarketing Through eLink.

ReadersMagnet markets publishing and book-promotion services to authors. It does so in part by outbound telephone calls. Asked to identify everyone involved in the calls to Plaintiff, ReadersMagnet answered that five named individuals "initiated telephone calls to Plaintiff" and that each was, "at the time the calls were initiated," an employee of eLink. (Ex. 5, No. 2.) Those individuals were "publishing consultants who were responsible for making telephone calls to the various authors to, in part, promote the services offered by ReadersMagnet." (Ex. 5, No. 3.) ReadersMagnet identifies eLink as the third party used for the calls and states that "eLink was hired to perform telemarketing services for ReadersMagnet." (Ex. 5, Nos. 4, 7.)

ReadersMagnet also supplied the operational details of the campaign. eLink used a dialing platform called ZOIPER. (Ex. 5, Nos. 2, 12.) When Plaintiff Billhimer complained to ReadersMagnet by letter, ReadersMagnet disciplined no one. "No one was reprimanded or terminated," in part because the consultant who first contacted Plaintiff "resigned from eLink immediately after Plaintiff sent a complaint to Defendant." (Ex.5, No. 14.)

ReadersMagnet's vice president, John Carl Abines, testified on November 6, 2026 as the designee of both ReadersMagnet and eLink on all noticed topics. (Ex. 6 at 3:5–16, 11:7–9, 19:24–20:5.) His testimony confirms that the relationship is long-standing, exclusive in practice, and controlled by ReadersMagnet. ReadersMagnet has used telemarketing "[e]ver since we started" in 2016, and it has worked with eLink since the fourth quarter of 2016 under a single written contract that has not been produced. (Ex. 6 at 5:14–20, 9:4–5, 23:5–18.) ReadersMagnet has been eLink's only customer since 2024, and at its peak paid it close to $900,000 a year. (Ex. 6 at 7:4–9, 8:21–9:11.) eLink was authorized to make outbound calls to prospective customers to promote

ReadersMagnet's services, and it is allowed to use ReadersMagnet's name on the calls. (Ex. 6 at 7:20–8:4.) ReadersMagnet tells eLink which services to promote, and it has changed the criteria for the calls for eLink to execute. (Ex. 6 at 8:5–17.) eLink writes the scripts, but ReadersMagnet reviews and "approves" them and has authority to change them. (Ex. 6 at 9:12–18.) ReadersMagnet receives productivity and revenue metrics from eLink, eLink is paid "[f]or a worked hour," and ReadersMagnet is paid by the authors who buy its services, in amounts up to $5,000. (Ex. 6 at 9:19–10:14.) The calls are placed by 55 eLink employees at a call center in the Philippines to individuals in the United States. (Ex. 6 at 7:15–19, 20:6–17, 23:2–4.) And Mr. Abines agreed that all of the calls in Defendants' calling-records spreadsheet were made exclusively by eLink and exclusively to promote ReadersMagnet's services. (Ex. 6 at 23:19–25.)

### B. Plaintiffs' Numbers Were on the Registry, and Defendants Called Them Anyway.

Ms. Billhimer registered her telephone number on the Registry on October 12, 2019, and has never removed it. (Second Am. Compl. ("SAC") ¶ 23, ECF No. 46; Ex. 2, Declaration of Edwina Billhimer ¶ 4, Ex. 2-A.) She uses the number for personal, residential, and household purposes, and it is not associated with any business. (SAC ¶¶ 24–25; Ex. 2 ¶ 3.) She has never been a ReadersMagnet customer. (SAC ¶ 27.) Beginning on November 22, 2023, she received repeated calls from callers who identified themselves as ReadersMagnet representatives and solicited ReadersMagnet's promotional services and book-marketing packages. (*Id.* ¶¶ 29–41; Ex. 2 ¶¶ 6-7.) The calls continued through October 24, 2024. (SAC ¶¶ 41–60.) ReadersMagnet does not dispute that eLink representatives called her; it admits that five eLink employees "initiated telephone calls to Plaintiff" (Ex. 5, No. 2), and its designee confirmed that eLink made telemarketing calls to her on behalf of ReadersMagnet. (Ex. 6 at 16:18–23.) He also did not dispute that she asked not to be contacted, and agreed that she was called afterward. (Ex. 6 at 16:24–17:9,

17:14–16.) The reason, he explained, was "another lapse because the office in San Diego did not open the letter in time"; her number was not added to the internal do-not-call list, and "[i]t should have been if the letter that we received was read on time." (Ex. 6 at 17:24–18:8.)

Mr. Cennamo listed his telephone number on the Registry in 2004 and has not removed it since. (SAC ¶ 62; Ex. 4, Declaration of Daniel Cennamo ¶ 4, Ex. 4-A.) He uses the number for personal, residential, and household purposes. (SAC ¶ 63; Ex. 4 ¶ 3.) He nonetheless received telemarketing calls promoting ReadersMagnet's marketing services, including calls in 2021 and at least three calls in 2022. (SAC ¶¶ 64–65; Ex. 4 ¶ 5.)

**C. Defendants' Own Data Identify the Class.**

Defendants produced index files titled DNCDTA 2021, DNCDTA 2022, DNCDTA 2023, and DNCDTA 2024, which list telephone numbers called and flag the numbers for each year, including with a "SAFE" designation. (Ex. 7 ¶¶ 25, 31(d) & n.10, Ex. 7-A.) Mr. Woolfson has more than twenty-five years of experience developing and analyzing telephone databases and has analyzed call records for Do Not Call compliance on behalf of both plaintiffs and defendants. (Ex. 7 ¶¶ 7, 15–16.) Using standardized SQL queries, he applied the following filters in sequence (*id.* ¶¶ 48–52):

- Starting set: 49,548 distinct telephone numbers in the DNCDTA files.
- Removed 1,847 numbers not associated with TCPA-eligible area codes, leaving 47,701.
- Removed 20,137 numbers that were not on the Registry, or were not on it for more than thirty days in the indicated year, and a further 2,357 numbers that were on the Registry in only one of the four years, leaving 25,207.
- Of those, identified 24,743 unique numbers that were on the Registry during a year in which Defendants' own data marked them "SAFE" to call.

The 24,743 numbers include Ms. Billhimer's. Her number is "indicated as SAFE in the Defendants' data, despite being on the DNC list," and there is no evidence that it was placed on

an internal do-not-call list. (Ex. 7 ¶ 52.) Mr. Woolfson's SQL queries and results are attached to his declaration. (Ex. 7 ¶ 53 & Exs. 6-8 & 6-9 to Ex. 7.) That analysis establishes the first criterion of the Class: Registry status for more than thirty days. The second, two or more calls within 365 days, depends on the call detail records. Mr. Woolfson has described the code he will apply to those records to tag each number that received two or more calls within 365 days (Ex. 7 ¶¶ 2–3, 31(g) & n.14), and the carrier records by which line type and subscriber information can be obtained for each number. (Ex. 7 ¶¶ 32, 43–47.)[2]

Defendants' designee did not dispute the premise of this analysis. Mr. Abines explained that "SAFE" means "safe to call or safe to upload," that is, not on the Registry. (Ex. 6 at 22:19–25.) He confirmed that eLink generated the calling records from its dialer data and that Defendants stipulated to them as business records. (Ex. 6 at 18:15–19:8.) And asked about Mr. Woolfson's report, which he had seen, he acknowledged seeing that thousands of the numbers were contacted while on the Registry, saying only that this "doesn't paint, you know, a total picture of things." (Ex. 6 at 12:16–23.)

### D. Defendants Refresh Their Registry Scrub Only Once a Year.

Mr. Abines testified that eLink buys the leads, that Owl Scope is one source, and that eLink also has thousands of numbers from Facebook and Twitter ads. (Ex. 6 at 12:2–12, 20:24–21:7.) He said that numbers are scrubbed against the Registry at the start of the lead life cycle and that Defendants then perform "an annual refresh," every twelve months rather than every thirty days, because "[t]he current process we have is a year." (Ex. 6 at 15:14–16:1.) eLink has no SAN number for the Registry, and instead "purchases the list from separate vendors." (Ex. 6 at 21:8–15.) Asked

[2] Mr. Woolfson's analysis of the DNCDTA files reflects the data produced to date. He has been informed that call detail records are forthcoming. (Ex. 7 ¶ 4 & n.10.)

why he had not produced the social-media permission evidence he described, Mr. Abines said that he "wasn't aware that we had to run those numbers or scrub those numbers from our current data list or database." (Ex. 6 at 13:8–16.)

### E. Defendants' Consent Contentions Are Unsupported by Any Produced Evidence.

Asked to state every fact supporting any contention that Plaintiff Billhimer consented to calls, ReadersMagnet identified a single episode: a conversation on or about October 23, 2024, in which an eLink consultant contacted Plaintiff, and a follow-up call the next day after which eLink emailed promotional materials. (Ex. 5, No. 9.) ReadersMagnet asserts that "[s]oon thereafter, Plaintiff, for the first time, requested that her number be put on Defendant's internal do-not-call list." (Ex. 5.) ReadersMagnet identified no consent form, no lead-source consent record, and no consent contention as to any other person. (Ex. 5, Nos. 9, 13.)

At his deposition, Mr. Abines added a new assertion. He testified that "probably half" of the Registry numbers in Mr. Woolfson's report came from "other streams of lead sources, like social media," where "there's a lot of requests to be contacted." (Ex. 6 at 12:24–13:3.) Asked whether Defendants have evidence of permission, he said yes, but asked whether any had been produced, he answered, "For that specific file, no," and he offered no explanation beyond that he "wasn't aware that we had to run those numbers or scrub those numbers." (Ex. 6 at 13:4–16.) Defendants' discovery default is part of the same record: a second set of discovery requests served in August 2025 has gone unanswered, and Mr. Abines did not know it existed. (Ex. 6 at 13:17–14:19.) Defense counsel stated that he could provide the responses by the following Monday, and Plaintiffs reserved the right to move to strike any such evidence and to assert that objections have been waived. (Ex. 6 at 14:20–15:12.) Mr. Abines also testified that Ms. Billhimer asked not to be contacted but, in later calls, asked for more information about ReadersMagnet's services. (Ex. 6 at

17:10–23.)

## III. LEGAL STANDARD

Class certification is appropriate where the prerequisites of Rule 23(a) are satisfied and any one subsection of Rule 23(b) is met. *Bell v. PNC Bank, N.A.*, 800 F.3d 360, 373 (7th Cir. 2015). Plaintiffs must prove certification is proper by a preponderance of the evidence, *Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 843 (7th Cir. 2022), and the class must be "sufficiently definite that its members are ascertainable," *Toney v. Quality Res., Inc.*, 323 F.R.D. 567, 577 (N.D. Ill. 2018). The inquiry entails "some overlap with the merits," but "grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013). The merits matter only insofar as they bear on whether the Rule 23 prerequisites are met, not whether they will ultimately be resolved in the class's favor. *Santiago v. City of Chicago*, 19 F.4th 1010, 1016 (7th Cir. 2021).

Section 227(c) of the TCPA directs the Federal Communications Commission to protect residential telephone subscribers' privacy and authorizes the national Do Not Call Registry. 47 U.S.C. § 227(c)(2)–(3). The implementing regulation provides that no person or entity shall initiate any telephone solicitation to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. § 64.1200(c)(2). A "telephone solicitation" is a call "for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services," and excludes calls made with the recipient's "prior express invitation or permission" or to a person with whom the caller has "an established business relationship." *Id.* § 64.1200(f)(15). Section 227(c)(5) gives a private right of action to a person "who has received more than one telephone call within any 12-month period by or on behalf of

the same entity in violation of the regulations," with recovery of "up to $500 in damages for each such violation," which the court may increase up to three times for willful or knowing violations. 47 U.S.C. § 227(c)(5).

The phrase "on behalf of" incorporates federal common law agency principles, and a seller may be held liable under actual authority, apparent authority, or ratification. *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 587 (7th Cir. 2021); *Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384, 395 (M.D.N.C. 2015) ("*Krakauer FRD*"); *see In re Dish Network, LLC*, 28 FCC Rcd. 6574, 6592–93 (2013). Prior express invitation or permission and an established business relationship are exclusions from the definition of a telephone solicitation, *id.* § 64.1200(f)(15), and consent is an affirmative defense that Defendants must prove. *See Blow v. Bijora, Inc.*, 855 F.3d 793, 803 (7th Cir. 2017); *Toney*, 323 F.R.D. at 586 (treating consent as an "affirmative defense"); 47 C.F.R. § 64.1200(c)(2)(ii) (permission "must be evidenced by a signed, written agreement between the consumer and seller").

## IV. ARGUMENT

### A. The Court Should Consider Mr. Woolfson's Analysis, Which Rests on a Reliable Methodology.

Because Mr. Woolfson's analysis bears on ascertainability, numerosity, and the existence of classwide proof, the Court should decide its admissibility before ruling on certification. When an expert's report is critical to class certification, the Seventh Circuit requires the district court to rule conclusively on any challenge to the expert's qualifications or submissions before ruling on the motion. *Toney*, 323 F.R.D. at 577 (citing *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012)). The Court asks whether the expert is qualified, whether the methodology is reliable, and whether the testimony is relevant. *Id.* at 578 (citing *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017)). That inquiry is directed at the reliability of the expert's method, and a court errs when it scrutinizes the quality of the data and the conclusions in

place of the method. *Id.* at 579 (citing *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013)). Disputes over how the choice of data inputs affects the conclusions of an accepted methodology "should normally be left to the jury." *Id.* at 580 (quoting *Manpower*, 732 F.3d at 808).

Mr. Woolfson meets that standard. He is qualified by more than twenty-five years of experience developing and analyzing telephone databases, including analysis of call records for Do Not Call compliance on behalf of plaintiffs and defendants. (Ex. 7 ¶¶ 7, 15–16.) His method is disclosed and replicable: he imported Defendants' own files into a SQL database, applied a sequence of stated filters to Defendants' own data, and attached the queries and the summary of results. (Ex. 7 ¶¶ 31, 48–53, Exs. 6-8 & 6-9.) *Toney* found a comparable method reliable where it was "founded on Quality's outgoing call data" and on lists of a kind used in the industry, even though the defendant's rebuttal expert disputed whether the results were accurate. 323 F.R.D. at 579. The court explained that the rebuttal expert's criticism, at most, raised the possibility of "flawed assumptions" about which lists to use, which would be a flaw going to "the weight of [the expert's] opinion, not its admissibility." *Id.* at 579–80. Courts presented with Registry classes have treated the same kind of analysis the same way. In *Mantha*, the court declined to exclude an expert who used a commercial service to determine whether numbers were on the Registry and when they were registered, because running a database check with a widely used commercial service "is a perfectly normal and reasonable methodology." 347 F.R.D. at 388. The court there also reasoned that a challenge to the accuracy of the expert's results is not a challenge to her method. *Id.* at 388–89.

Defendants have not identified any number in the analysis that was not on the Registry. Their designee reviewed Mr. Woolfson's report and, rather than dispute Registry status, said only

that the picture was incomplete because some leads came from social-media sources, a consent contention for which nothing has been produced. (Ex. 6 at 12:16–13:16.) Nor can they dispute the "SAFE" designations, which are their own and which Mr. Abines explained mean "safe to call." (Ex. 6 at 22:19–25.) If Defendants contend that their files are unreliable, that contention is a reason to doubt their records, not Plaintiffs' method, and would be a reason to credit the poor-recordkeeping rule discussed below.

### B. The Class Satisfies Rule 23(a).

#### *1. The Class is ascertainable.*

A class satisfies this threshold where it is "defined clearly" by "objective criteria rather than by . . . a class member's state of mind," and the Seventh Circuit has "declin[ed] to" adopt any heightened administrative feasibility requirement imposed by some other circuits. *Mullins v. Direct Digit., LLC*, 795 F.3d 654, 657–58, 661 (7th Cir. 2015). The Class is defined by two objective facts: whether a number was on the Registry for more than thirty days, and whether it received two or more calls within 365 days from the campaign promoting ReadersMagnet. Neither depends on any class member's thoughts or actions. And Plaintiffs have done more than propose a method. Mr. Woolfson has already applied the first criterion to Defendants' data and has described how the second will be applied to the call detail records. (Ex. 7 ¶¶ 2–3, 31, 48–53.)

Courts certifying Registry classes have approved exactly this approach. In *Mantha v. QuoteWizard.com, LLC*, 347 F.R.D. 376 (D. Mass. 2024), the court held the class ascertainable because the plaintiff "need only put forward objective criteria that makes the identification of the putative Class administratively feasible," and the defendant's own internal records "reflect the total possible population from which the Class can be drawn." *Id.* at 392. The court accepted a methodology that compared the defendant's internal do-not-call files and third-party databases,

and held that "it is enough, for ascertainability purposes, that Mantha has offered an objective means to ascertain the Class," even though the defendant disputed the methodology's accuracy. *Id.* at 392.

This is the opposite of *Donaca v. Dish Network, LLC*, 303 F.R.D. 390 (D. Colo. 2014), where the court found that members of a prerecorded-call class could not be identified without "individual investigation and fact-finding." *Id.* at 397. Here Defendants' own files list the numbers called, and the Registry status of each number is determined by comparison with Registry data. Nor is the Class defined by the legal conclusion that a member was injured. Plaintiffs' definition omits the word "residential," as the *Mantha* court did when it refined a Registry class definition "[t]o avoid the need to make a legal determination as to whether a particular telephone number is residential prior to its inclusion in the putative Class." 347 F.R.D. at 391. The Class is ascertainable.

***2. Numerosity is satisfied.***

Rule 23(a)(1) requires a class "so numerous that joinder of all members is impracticable." Plaintiffs bear the burden of proving numerosity by a preponderance of the evidence. *Hossfeld v. Allstate Ins. Co.*, 179 F.4th 1046, 1059 (7th Cir. 2026). The "key numerosity inquiry" is "not the number of class members alone but the practicability of joinder," which depends on the nature of the action, the size of the individual claims, and the location of the class members. *Id.* (quoting *Anderson v. Weinert Enters., Inc.*, 986 F.3d 773, 777 (7th Cir. 2021)). A class of forty or more is often sufficient but does not guarantee numerosity, and a plaintiff must offer evidence rather than "speculation as to the size of the class." *Id.* at 1059–60 (quoting *Anderson*, 986 F.3d at 777–78).

Plaintiffs' showing rests on Defendants' own records and a disclosed method, not on conjecture. In *Hossfeld*, the plaintiff identified thirty-three numbers on a defendant's internal list,

offered no evidence for his assurance that more existed, and made no argument about impracticability. *Id.* at 1059–60. Here, Defendants' data identify 24,743 unique numbers that were on the Registry for more than thirty days while marked "SAFE" to call. (Ex. 7 ¶¶ 49–52.) *Hossfeld* is a numerosity case about a shortfall of proof, and Plaintiffs do not rely on the forty-member benchmark alone.

Each practicability factor also shows that joinder is impracticable. *First*, the nature of the action: the Class members are consumers whose only common link is that Defendants' campaign called numbers on the Registry, and identifying and serving each of them individually would require the subscriber-record process described by Mr. Woolfson. (Ex. 7 ¶¶ 32, 43–47.) *Second*, the size of the claims: each member's claim is worth $500 per violation, 47 U.S.C. § 227(c)(5), an amount too small to support separate suits, which is why the class device exists for cases in which the injury is substantial in the aggregate. *See Toney*, 323 F.R.D. at 593 (quoting *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006)). *Third*, location: the numbers are assigned to TCPA-eligible area codes across the United States, so joinder in one action would require parties spread across the country. Joinder is impracticable.

***3. Commonality is satisfied.***

Rule 23(a)(2) requires a common contention "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014).

That standard is met many times over. Every class member's claim arises from the same

conduct: calls placed by eLink's consultants, using the same dialing platform and a common source of leads, to promote ReadersMagnet's services to numbers on the Registry. The common questions include (1) whether the calls were "telephone solicitations" under 47 C.F.R. § 64.1200(f)(15); (2) whether ReadersMagnet is liable for eLink's calls as the party on whose behalf they were made; (3) whether Defendants can establish consent or an established business relationship through any classwide evidence; (4) whether Defendants' "SAFE" designations reflect any Registry-scrubbing process at all; and (5) whether Defendants acted willfully or knowingly. Courts have recognized that such questions are common in Registry cases. *See Hand v. Beach Entm't KC, LLC*, 456 F. Supp. 3d 1099, 1140–41 (W.D. Mo. 2020) (whether messages were telephone solicitations, and whether the principals could be liable for them, were common questions whose resolution "will resolve an issue that is central to each class members' claims in one stroke"); *Krakauer*, 925 F.3d at 656 (a § 227(c)(5) plaintiff "can rely largely on common proof to make out his claim").

***4. Typicality is satisfied.***

A claim is typical where it "arises from the same event or practice or course of conduct that gives rise to the claims of other class members" and rests on "the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). Typicality is a low hurdle that tolerates factual variation, and it is "determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members." *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996).

Plaintiffs' claims are the same claims as the rest of the Class's. Like every member, Ms. Billhimer's number was on the Registry for more than thirty days, was marked "SAFE" in Defendants' data, and was called more than once within 365 days by eLink for ReadersMagnet. (Ex. 7 ¶ 52; SAC ¶¶ 23, 29–60; Ex. 2 ¶¶ 4, 6-7.) Mr. Cennamo's number, on the Registry since

2004, was likewise called repeatedly, including at least three times in 2022, and is on the Class list. (SAC ¶¶ 62, 65; Ex. 4 ¶¶ 4-5; Ex. 1 ¶ 7.) Their claims and the Class's claims rise and fall on the same two questions: whether Defendants violated § 64.1200(c)(2), and whether ReadersMagnet is answerable for eLink's calls. *Accord Hand*, 456 F. Supp. 3d at 1142 ("The claims here arise out of the same conduct—the sending of text messages to individuals registered on the national do-not-call registry.").

The consent contention ReadersMagnet has directed at a Plaintiff does not make either of them atypical. It concerns a conversation on or about October 23, 2024, and so by its own terms could bear only on calls made on or after that date. (Ex. 5, No. 9.) Ms. Billhimer's claim, and class membership, rest on calls that began nearly a year earlier, on November 22, 2023. (SAC ¶ 29.) Mr. Cennamo's calls took place in 2021 and 2022, years before that conversation. (SAC ¶ 65.) A request that a caller send information by email is not "a signed, written agreement between the consumer and seller" that "includes the telephone number to which the calls may be placed." 47 C.F.R. § 64.1200(c)(2)(ii). In any event, this is a dispute about the meaning of a single exchange, not a defense that would consume the trial, and the question of what the regulation requires for consent is the same for every class member. *See Mantha*, 347 F.R.D. at 397 (where consent turned on a single classwide legal determination, "QuoteWizard's consent defense can be resolved through a single ruling"). Defendants have produced no consent evidence as to Mr. Cennamo or any other class member, and Mr. Abines's unsupported assertion about social-media leads, addressed below, is not evidence of consent by either Plaintiff.

***5. Plaintiffs and their counsel are adequate.***

Adequacy asks whether the representatives share the same interest and injury as the class and are free of disabling conflicts, and counsel must satisfy Rule 23(g). *Amchem Prods., Inc. v.*

*Windsor*, 521 U.S. 591, 625 (1997); Fed. R. Civ. P. 23(g)(1)(B), (4). Plaintiffs' interest, ending Defendants' unlawful calling and obtaining statutory redress, is identical to the Class's. They have no interests inconsistent with the Class, understand and accept a representative's duties, and brought this case to vindicate their and others' privacy rights. (Ex. 2 ¶¶ 10-11; Ex. 4 ¶¶ 7-8.) Ms. Billhimer responded to written discovery and has arranged for counsel to advance the costs of the action, including class notice. (Ex. 2 ¶¶ 11-12.) She also pursued her claim before suit by sending Defendants a certified letter on September 12, 2024, which Defendants received on September 18, 2024 and did not answer. (SAC ¶¶ 47–52.) Mr. Cennamo has likewise agreed to advance the costs of the action through counsel. (Ex. 4 ¶ 9.)

Proposed class counsel, Paronich Law, P.C., has the experience and resources to prosecute this action. (Ex. 1 ¶¶ 3-4 (TCPA class experience, prior appointments, resources committed, Rule 23(g)(1)(A) factors).) Plaintiffs also ask the Court to appoint Strauss Borrelli PLLC, through Cassandra P. Miller, as additional class counsel. (Ex. 3, Declaration of Cassandra P. Miller ¶¶ 2–12, 14 & Ex. A (Strauss Borrelli PLLC firm resume).) Adequacy is satisfied.

### C. Common Questions Predominate.

This case rises and falls on Defendants' conduct and the conduct of their agents, not on anything any class member did. "An individual question is one where members of a proposed class will need to present evidence that varies from member to member; a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Gorss Motels*, 29 F.4th at 843–44. Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. The Class need not be devoid of individual questions; it is sufficient that the common ones predominate. *Messner v. Northshore Univ. HealthSystem*,

669 F.3d 802, 815 (7th Cir. 2012) ("The text of Rule 23(b)(3) itself contemplates that such individual questions will be present."). And the Court need not decide whether the common questions will ultimately be resolved in the class's favor, only that they predominate. *Amgen*, 568 U.S. at 459.

#### 1. *The elements of a Registry claim are provable with common, record-based evidence.*

Section 227(c)(5) "offers many advantages for class-wide adjudication," because it requires a plaintiff to show only "a number on the Do-Not-Call registry, and two calls made to that number in a year." *Krakauer*, 925 F.3d at 655–56. A plaintiff suing under it "is likely to be in the same position as a great many other people and can rely largely on common proof to make out his claim." *Id.* at 656. The Fourth Circuit affirmed predominance in *Krakauer* because "all of the major issues in the case could be shown through aggregate records." *Id.* at 658.

The same is true here. Registry status and call counts are established by comparing Defendants' call data with Registry data, which Mr. Woolfson has done using one set of queries for the entire Class. (Ex. 7 ¶¶ 48–53.) Whether the calls were telephone solicitations is established by what the calls were for, and ReadersMagnet admits that the purpose was, "in part, [to] promote the services offered by ReadersMagnet." (Ex. 5, No. 3.) None of these elements requires a class member to testify.

#### 2. *Whether ReadersMagnet is answerable for eLink's calls is a single, classwide question.*

Whether ReadersMagnet is liable for eLink's calls "is the second key question for determining liability, and its importance cannot be minimized. Indeed, it is the central issue on which liability depends." *Krakauer FRD*, 311 F.R.D. at 394–95. It is also a common question. Under § 227(c)(5), a seller may be held liable for calls made "by or on behalf of" it, and the federal

common law of agency governs. *Hossfeld*, 179 F.4th at 1052–53 (applying Restatement (Third) of Agency); *see Bilek*, 8 F.4th at 587. Each theory the Seventh Circuit recognizes asks what the principal itself did: what it manifested to the agent (actual authority), what it manifested to third parties (apparent authority), and whether it affirmed the agent's acts (ratification). *Hossfeld*, 179 F.4th at 1053. "It is well-established that whether an agency relationship exists is a factual determination," and actual authority "depends only on the relationship and conduct between" the seller and the caller, so that if it is proved "the class may recover from [the seller] for any violations by" the caller. *Krakauer FRD*, 311 F.R.D. at 395. The same evidence, ReadersMagnet's relationship with eLink, would be offered for every class member.

*Actual authority.* An agent acts with actual authority when it reasonably believes, "in accordance with the principal's manifestations to the agent," that the principal wishes it to act. *Hossfeld*, 179 F.4th at 1053 (quoting *Bilek*, 8 F.4th at 587). The question is whether ReadersMagnet manifested assent that eLink act on its behalf and subject to its control. *See Hand*, 456 F. Supp. 3d at 1129 (quoting Restatement (Third) of Agency § 1.01). ReadersMagnet has admitted that it hired eLink "to perform telemarketing services for ReadersMagnet," that eLink's consultants were assigned to call authors "to promote the services offered by ReadersMagnet," and that eLink's follow-up email to Plaintiff "contained promotional materials for ReadersMagnet." (Ex. 5, Nos. 3, 7, 9.) Its designee confirmed each marker of that authority: ReadersMagnet authorized the calls, allows eLink to use its name, tells eLink what to promote, sets and changes the calling criteria, "approves" and may change the scripts, and receives eLink's metrics. (Ex. 6 at 7:20–10:1.) This is not *Hossfeld*, where the callers were engaged by a vendor that the defendant's agents hired, and the defendant's contract language was directed at its own agents and not at the vendor, so it supplied no actual authority to reach the callers. 179 F.4th at

1055–56. The callers here are employees of the entity ReadersMagnet itself hired. (Ex. 5, Nos. 2–4, 7; Ex. 6 at 23:2–4.) Because all of this concerns the ReadersMagnet–eLink relationship, the answer cannot vary by class member. Any contractual disclaimer of agency would not change the analysis: "[w]hether a relationship is characterized as agency in an agreement between parties . . . is not controlling." *Hand*, 456 F. Supp. 3d at 1130 (quoting Restatement (Third) of Agency § 1.02).

*Apparent authority.* Apparent authority arises when a third party reasonably believes the caller is authorized and the belief is traceable to the principal's manifestations. *Hossfeld*, 179 F.4th at 1053, 1056. The principal "must speak, write, or otherwise act toward a third party"; statements by the agent alone do not suffice, and the plaintiff must show reasonable reliance. *Id.* at 1056–57. Plaintiffs do not depend on this theory to establish classwide liability, because actual authority and ratification are sufficient and turn only on ReadersMagnet's conduct. ReadersMagnet itself allowed eLink to use its name on the calls, (Ex. 6 at 8:2–4), and the callers identified themselves as ReadersMagnet representatives, (SAC ¶ 29; (Ex. 2 ¶ 6)), so the manifestation element is common to all calls. (*See* Ex. 5, No. 9 (follow-up email "contained promotional materials for ReadersMagnet").) Plaintiffs acknowledge that the reliance element may raise member-specific issues, which is a further reason the Court need not reach this theory to certify.

*Ratification.* A principal ratifies an agent's act by manifesting assent to it, including by knowingly retaining its benefits, or by failing to object or repudiate when it knows the material facts and has notice that others are likely to infer assent from its silence. *Hossfeld*, 179 F.4th at 1053, 1057–58. In *Hossfeld*, the Seventh Circuit rejected a ratification theory resting on benefits from a defendant's telemarketing programs generally, because a plaintiff suing alone may challenge only the calls placed to him "(absent a class action)." *Id.* at 1057. That limit does not apply here. In a class action the calls to every member are at issue, so the question of what benefits

ReadersMagnet knowingly retained from the campaign is a single question about ReadersMagnet. Nor did ReadersMagnet respond as the defendant did in *Hossfeld*, which promptly traced the calls, investigated, and cut off the telemarketer. *Id.* at 1058. After Ms. Billhimer's letter put ReadersMagnet on notice, it disciplined no one, (Ex. 5, No. 14), and calls to her continued. (SAC ¶¶ 47–60.) Its designee conceded that her number should have been placed on the internal do-not-call list and was not because the letter went unopened. (Ex. 6 at 17:24–18:8.) Meanwhile, ReadersMagnet kept the benefits of the campaign: it is paid by the authors the consultants reach, and it reviews eLink's productivity and revenue metrics. (Ex. 6 at 9:19–10:14.)

Nor can ReadersMagnet avoid the common answer by arguing that some calls were made for others. The calls at issue promote ReadersMagnet's services, and ReadersMagnet has identified no other principal; its designee agreed that all of the calls in Defendants' calling-records spreadsheet were made exclusively by eLink and exclusively to promote ReadersMagnet's services. (Ex. 6 at 23:19–25.) And even if a subset were somehow outside the campaign, that would be a "minor, peripheral" issue that "do[es] not defeat the predominance of the central issue: whether the calls were made by [the seller's] agent." *Krakauer FRD*, 311 F.R.D. at 399–400.

***3. Whether the numbers are residential can be resolved with classwide proof.***

Section 64.1200(c)(2) protects "residential" subscribers. Defendants may argue that determining which Registry numbers are residential requires individualized inquiries. The argument fails for four reasons.

*First*, a Registry number is presumptively residential. The FCC has presumed that wireless subscribers who ask to be placed on the national do-not-call list are residential subscribers. *Chennette v. Porch.com, Inc.*, 50 F.4th 1217, 1223 (9th Cir. 2022) (discussing 2003 TCPA Order). The Ninth Circuit adopted that presumption and held that "registered cell phones that are used for

both personal and business purposes are presumptively 'residential'"; a defendant may rebut it by showing that the phone is a business line, considering how the number is held out to the public, how it is registered with the carrier, how much it is used for business, who pays the bill, and other factors. *Id.* at 1225; *accord Payne v. Sieva Networks, Inc.*, 347 F.R.D. 224, 227 (N.D. Cal. 2024) (applying *Chennette*); *Mantha*, 347 F.R.D. at 397 (applying the presumption to numbers on the Registry); *Hand*, 456 F. Supp. 3d at 1120 ("A cell phone user can qualify as a residential telephone subscriber under 47 C.F.R. § 64.1200(c) and (d)."). The burden of rebutting the presumption is Defendants'. The rebuttal factors are, moreover, matters Defendants can try with their own evidence about the subset of numbers they claim are business lines, not with testimony from every member.

Plaintiffs recognize that, after *McLaughlin Chiropractic Associates, Inc. v. McKesson Corp.*, 606 U.S. 146 (2025), a district court is not bound by the FCC's interpretation and must decide for itself whether it is correct, giving it appropriate respect. *Wilson v. Hard Eight Nutrition LLC*, 804 F. Supp. 3d 1141, 1147–48 (D. Or. 2025). The courts that have undertaken that analysis independently have reached the same conclusion. *Id.* at 1151 ("without deferring to the FCC, the Court independently concludes that the FCC got it right" and that a cell phone is presumptively residential under § 227(c)); *see Klassen v. Solid Quote LLC*, 702 F. Supp. 3d 1052, 1057 (D. Colo. 2023) ("a cellular phone, provided adequate facts are established, can and should be considered residential"). The presumption therefore supplies a common starting point for every number.

*Second*, Defendants' own account of the campaign shows that it targeted individuals. ReadersMagnet states that its consultants called "the various authors" to promote its services. (Ex. 5, No. 3.) Its designee agreed that the people eLink tries to reach for ReadersMagnet are "[i]ndividual people," not companies. (Ex. 6 at 24:1–5.) In *Mantha*, the court relied on the

defendant's repeated statements that it "only intended to purchase lead information associated with individual consumers rather than businesses" as classwide evidence of residential status. 347 F.R.D. at 398. This case is unlike *Payne*, where the defendant "targets trucking businesses" and called only numbers those businesses had listed with a federal transportation registry, which the court viewed as "some indication of a nonresidential use." 347 F.R.D. at 227–28. Defendants here have no comparable basis for treating the called numbers as business lines.

*Third*, Plaintiffs have a classwide method. Telephone carriers maintain historical records of whether each number is a residential or business line, and Mr. Woolfson has described how those records are obtained for all numbers at once. (Ex. 7 ¶¶ 32, 43–47.) *Payne* is not to the contrary. The question there "is not whether the issue requires discovery; it is whether it can be resolved by common proof," and the plaintiff offered no such proof. 347 F.R.D. at 228. Plaintiffs offer it here.

*Fourth*, even if some numbers turned out to be business lines, that would not defeat predominance. "Even if a handful of numbers—QuoteWizard does not indicate how many—are not, in fact, residential, that does not warrant denial of class certification." *Mantha*, 347 F.R.D. at 398. In *Krakauer FRD* the defendant pointed to "a few dozen" possible business numbers, and the court held that "[t]he fact that a class list contains members whose claims may fail on the merits does not mean that the class cannot be certified." 311 F.R.D. at 396; *see id.* at 396–97 (class should not be certified only "if it is apparent that it contains a great many persons who have suffered no injury," quoting *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009)). As in *Mantha*, a defendant that wishes to try the residential status of individual numbers must come forward with evidence to do so, and "[i]t disclosed no evidence or witnesses to support such mini-trials as to even one of the numbers on the Class List." 347 F.R.D. at 398.

### *4. Consent and established business relationship are not individualized issues.*

Consent is an affirmative defense on which Defendants bear the burden. *See Toney*, 323 F.R.D. at 586–88; *Blow*, 855 F.3d at 803. Prior express invitation or permission and an established business relationship are exclusions written into the definition of a telephone solicitation. 47 C.F.R. § 64.1200(f)(15). Lack of consent is provable on a classwide basis here for three reasons.

*First*, Defendants have identified no classwide consent evidence. The only consent contention in their sworn responses concerns Ms. Billhimer alone, (Ex. 5, No. 9), and the only other one, Mr. Abines's assertion that "probably half" of the Registry numbers came from other lead streams such as social media, is unaccompanied by any produced document. (Ex. 6 at 12:24–13:16.) Whether individualized consent defeats predominance is decided "on a case-by-case basis after evaluating the specific evidence available to prove consent." *Toney*, 323 F.R.D. at 586 (quoting *Physicians Healthsource, Inc. v. A–S Medication Sols., LLC*, 318 F.R.D. 712, 725 (N.D. Ill. 2016)). Individualized consent predominates when a defendant produces specific evidence that a significant percentage of the class consented, but when the defendant "fails to set forth this specific evidence and instead only makes vague assertions about consent," it does not. *Id.* at 586–87 (citing *Legg v. PTZ Ins. Agency, Ltd.*, 321 F.R.D. 572, 577–78 (N.D. Ill. 2017)). A defendant likewise cannot defeat certification by invoking "the very specter of possible consent" without specific evidence. *Id.* at 588 (quoting *A Custom Heating & Air Conditioning, Inc. v. Kabbage, Inc.*, 2018 WL 488257, at *4 (N.D. Ill. Jan. 18, 2018)). *Legg* illustrates the other side of the line: the defendants there supplied affidavits from adopters and from shelter employees about what each adopter was told, evidence the court concluded would require "hundreds, if not thousands, of mini-trials." 321 F.R.D. at 578. Defendants here have offered nothing of that kind; Mr. Abines's assertion that some leads came from social-media "requests to be contacted," (Ex. 6 at 13:1–3), is

the sort of "vague assertion[] about consent" that does not create a predominating individual issue. This is also not *Donaca*, where the defendant came forward with sworn testimony and a standard sign-up form that "arguably establishes that every person in the group" consented. 303 F.R.D. at 400. A defendant that has no such evidence cannot create a predominating individual issue by speculating that some class members may have consented. As *Hand* held, "[d]efendants cannot manufacture individualized issues by claiming individual testimony is required to corroborate what is otherwise a common theory," 456 F. Supp. 3d at 1150, and "the mere mention of a defense is not enough to defeat the predominance requirement of Rule 23(b)(3)," *id.* at 1151 (quoting *Bridging Cmtys. Inc.*, 843 F.3d at 1126).

*Second*, Defendants cannot rely on their own poor recordkeeping. Where the defendant did not retain the records that would show consent, refusing to certify "would 'create an incentive for a person to violate the TCPA on a mass scale and keep no records of its activity, knowing that it could avoid legal responsibility for the full scope of its illegal conduct.'" *Hand*, 456 F. Supp. 3d at 1150 (quoting *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 250 (N.D. Ill. 2014)); *see Mullins*, 795 F.3d at 668 ("[R]efusing to certify on this basis effectively immunizes defendants from liability because they chose not to maintain records of the relevant transactions"); *Krakauer FRD*, 311 F.R.D. at 393 (to deny certification because a defendant keeps inadequate records "would create the perverse incentive for entities to keep poor records and to violate the TCPA's clear requirement"). Defendants' data labeled Ms. Billhimer's Registry-listed number "SAFE." Defendants' designee conceded that none of the permission evidence he described has been produced and that Defendants did not scrub the numbers in their database as he now suggests they should have. (Ex. 6 at 13:4–16.) If that label reflects any scrubbing process, it is a uniform process that Defendants must explain once; if not, it is the absence of any process at all.

*Third*, even a consent theory that Defendants might raise would be decided by a common legal rule. The regulation requires that permission be "evidenced by a signed, written agreement between the consumer and seller." 47 C.F.R. § 64.1200(c)(2)(ii). Whether the lead-generation arrangements through Owl Scope, or the social-media "requests to be contacted" Mr. Abines described, (Ex. 6 at 13:1–3), could satisfy that standard is a question that "can be resolved through a single ruling." *Mantha*, 347 F.R.D. at 397.

***5. Standing, damages, and defenses do not defeat predominance.***

*Standing.* Each class member received repeated telemarketing calls after registering on the Registry. A "claim under § 227(c)(5) accrues only once a telemarketer disregards the registry and actually places multiple calls," conduct that causes "harm [that] is both particular to each person and imposes a concrete burden on his privacy." *Mantha*, 347 F.R.D. at 397 (quoting *Krakauer*, 925 F.3d at 654). The Eleventh Circuit has likewise recognized that a class "based on calls made to individuals on the National Do Not Call Registry" presents no standing problem, because those whose numbers are on the Registry and who nevertheless received marketing calls "suffered an injury that is traceable to" the caller's misconduct. *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1271 (11th Cir. 2019). That is why Plaintiffs propose a Registry class only. The standing problem in *Cordoba* arose in an internal do-not-call class, where some members never asked to stop being called. *Id.* at 1271–72. Plaintiffs reserve the right to seek certification of an internal do-not-call class if Defendants produce the necessary list.

*Damages.* Statutory damages are set by the number of violations, and the amount per violation is fixed by Congress. 47 U.S.C. § 227(c)(5). Any enhancement for willful or knowing violation turns on Defendants' own conduct, which is common to the Class. Treble damages require "reckless or knowing behavior," not merely volitional acts, *Hossfeld*, 179 F.4th at 1059,

and recklessness means a risk of violation that is "serious and eminently avoidable" and known or so obvious that it should have been known. *Id.* at 1058. Whether Defendants' practices meet that standard, such as marking Registry-listed numbers "SAFE" to call (Ex. 7 ¶¶ 50–52) or performing a registry scrub once every twelve months rather than every thirty days (Ex. 6 at 15:14–16:1), is a question about Defendants' uniform conduct. Plaintiffs do not ask the Court to decide it now. That Defendants "may face a potentially larger liability in a class action" is no reason to deny certification, because "[t]he text of the statute makes absolutely plain that, in Congress's judgment, damages of $500 for each violation, or triple that if the violations are willful, are proportionate and appropriate compensation for the consumer." *Hand*, 456 F. Supp. 3d at 1153 (quoting *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674, 691 (S.D. Fla. 2013)). The statutory safe-harbor defense in § 227(c)(5) for a defendant that "has established and implemented, with due care, reasonable practices and procedures," is likewise a question about Defendants' uniform practices, and Defendants bear the burden on it. So is the regulation's safe harbor for error, which requires a process employing a version of the Registry obtained "no more than 31 days prior to the date any call is made," together with records documenting the process. 47 C.F.R. § 64.1200(c)(2)(i)(D). Defendants' designee testified that Defendants refresh their Registry scrub every twelve months and that eLink has no Registry SAN of its own. (Ex. 6 at 15:14–16:1, 21:8–15.)

**D. A Class Action Is Superior.**

Rule 23(b)(3) directs the Court to consider the class members' interest in individually controlling separate actions, existing litigation, the desirability of concentrating the claims in this forum, and manageability. Each favors certification. As in *Krakauer FRD*, "[g]iven the relatively small statutory damages, . . . the class members likely have little interest in controlling the litigation

in this case." 311 F.R.D. at 400 (citation omitted). Individually, "the costs of prosecuting each class member's claims individually would likely exceed each member's damages," and absent a class "[t]housands of putative class members would have to bring claims individually." *Hand*, 456 F. Supp. 3d at 1152–53. Plaintiffs are aware of no other litigation by class members concerning these calls. Concentrating the claims here is desirable because the claims arise from one campaign.

Manageability is no bar. Identification of the Class members proceeds from Defendants' own data and an existing methodology, and "refusing to certify on manageability grounds alone should be the last resort." *Mullins*, 795 F.3d at 664; *see Toney*, 323 F.R.D. at 593 (superiority met where defendant "produced call logs listing the cell phone numbers it called" and common issues were subject to generalized proof). Notice can be directed to class members through the carriers' subscriber records, using the data-exchange process Mr. Woolfson has already structured. (Ex. 7 ¶¶ 32, 43–47.) Any difficulty in identifying members is a problem of Defendants' own making, since the DNCDTA files are Defendants' records, and Defendants should not be rewarded for any shortcomings in their recordkeeping. *Mullins*, 795 F.3d at 662, 668.

## V. CONCLUSION

This case presents one telemarketing company, one vendor, one campaign promoting ReadersMagnet's services, and one set of Defendants' calling records that identify numbers on the Registry marked "SAFE" to call anyway. The questions that decide liability can be answered once, on common evidence, for every class member. Plaintiffs respectfully request that the Court certify the proposed Class, appoint Plaintiffs Edwina Billhimer and Daniel Cennamo as class representatives, appoint Paronich Law, P.C. and Strauss Borrelli PLLC, through Cassandra P. Miller, as class counsel under Rule 23(g), and grant such further relief as is just.

*[Counsel signatures to follow on next page.]*

RESPECTFULLY SUBMITTED this 16th day of November, 2026.

*/s/ Cassandra P. Miller*
Cassandra P. Miller
**STRAUSS BORRELLI PLLC**
980 N Michigan Ave., Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
cmiller@straussborrelli.com

*I certify this memorandum is less than 30 pages in compliance with Southern District of Indiana Local Rule 7-1(e).*

Anthony Paronich
**PARONICH LAW. P.C.**
350 Lincoln Street, Suite 2400
Hingham, MA 02043
Telephone: (617) 485-0018
Facsimile: (508) 318-8100
anthony@paronichlaw.com

*Counsel for Plaintiffs and the Putative Class*

**CERTIFICATE OF SERVICE**

I, Cassandra P. Miller, hereby certify that on November 16, 2026, I caused the foregoing to be electronically filed with the Court using the Court's CM/ECF system which will send an electronic copy to all parties and/or their counsel of record.

DATED this 16th day of November, 2026.

Respectfully submitted,

*/s/ Cassandra P. Miller*

Cassandra P. Miller
**STRAUSS BORRELLI PLLC**
980 N Michigan Ave., Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
cmiller@straussborrelli.com